1
2
3
4
5
6
7
8
9
10
11

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

12

RON MORTON, JR.,                              1:06-CV-00873 OWW NEW (DLB) HC

13                    Petitioner,             FINDINGS AND RECOMMENDATION
                                              REGARDING PETITION FOR WRIT OF
14        v.                                  HABEAS CORPUS

15

16   KATHY MENDOZA-POWERS, Warden,

17                    Respondent.
     _____/

18

19        Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

20   to 28 U.S.C. § 2254.  Petitioner is represented in this action by Joseph V. Camarata, Esq.

21                           **PROCEDURAL BACKGROUND**

22        Petitioner is currently in the custody of the California Department of Corrections pursuant

23   to a judgment of the Superior Court of California, County of Los Angeles, following his

24   conviction by plea of guilty on December 20, 1990, to first degree murder in violation of Cal.

25   Penal Code § 187(a). See Respondent's Answer to Petition (hereinafter "Answer"), Exhibit A at

26   1.  Petitioner was sentenced to serve an indeterminate term of twenty-five years to life in state

27   prison with the possibility of parole. Id.

28        On April 22, 2004, Petitioner's first parole suitability hearing was held before the

1  California Board of Prison Terms (now the Board of Parole Hearings - "BPH"). <u>See</u> Answer,

2  Exhibit B. Petitioner attended the hearing and represented himself.[1] <u>Id</u>. At the conclusion of the

3  hearing, the BPH denied parole and deferred rehearing for two years. <u>Id</u>. at 65.

4        Petitioner then sought relief in the state courts. Petitioner filed a habeas petition in the

5  Los Angeles County Superior Court on June 29, 2005, which was denied on August 15, 2005.

6  <u>See</u> Answer, Exhibit D. He then filed a habeas petition in the California Court of Appeals, Fifth

7  Appellate District on November 22, 2005. <u>See</u> Answer, Exhibit D. That petition was denied with

8  citation to <u>In re Rosenkrantz</u>, 29 Cal.4th 616 (2002) and <u>In re Dannenberg</u>, 34 Cal.4th 1061

9  (2005). <u>Id</u>. On December 1, 2005, Petitioner filed a habeas petition in the California Supreme

10  Court. <u>See</u> Answer, Exhibit E. On February 22, 2006, the petition was denied. <u>Id</u>.

11        Petitioner filed the instant petition for writ of habeas corpus on May 23, 2006, in the

12  United States District Court, Central District of California. The petition was transferred to this

13  Court on June 30, 2006. The petition challenges the 2004 decision of the BPH denying parole.

14  Petitioner contends the decision violated his constitutional rights under the Fifth and Fourteenth

15  Amendments where the parole hearing was a pro forma sham following predetermined policy,

16  and where the decision was not supported by any evidence.

17        On December 11, 2006, Respondent filed an answer to the petition. Petitioner filed a

18  traverse on January 31, 2007. Also on January 31, 2007, Petitioner filed a motion for discovery.

19  On May 3, 2007, Petitioner's motion was granted. In response to the motion for discovery,

20  Respondent filed computer print-outs showing those inmates who had been granted parole on

21  their initial parole hearing. Petitioner filed a supplement on May 22, 2007, commenting on the

22  data produced by Respondent. He moved to update the supplement on May 29, 2007, and the

23  Court granted the motion.

24                                      **FACTUAL BACKGROUND**[2]

25        On the afternoon of May 17, 1988, Defendant Devin Otte ("Otte") had a telephone

26  

27       [1]Petitioner had signed a "BPT 1003 form" on August 20, 2003, wherein he declined representation by counsel. <u>See</u> Answer, Exhibit B at 3.

28       [2]The information is derived from the probation officer's report. <u>See</u> Answer, Exhibit C at 2-4.

conversation with the victim, John Johnston, regarding the purchase of narcotics. At approximately 5:30 p.m., the victim left his house with a brown bag containing $17,000.00 in cash. He was picked up by Otte who then drove the victim to a remote location in Granada Hills near Sesnon and Louise Streets.  Petitioner was observed hiding in the bushes at the location while Defendant Johnson ("Johnson") was waiting in a red vehicle. Three gunshots were heard and three people were seen in the roadway. Petitioner was pulling a rifle when Otte yelled, "You shot me in the foot." Two of the defendants got into a blue Mustang while a third got into the red car with the weapon. Both cars sped away.

The victim was found in the bushes with two bullet holes in his chest. Bullet casings found at the scene matched nine millimeter ammunition used in the Uzi rifle. The coroner's examination revealed death to be the result of multiple gunshot wounds. The coroner recovered nine millimeter slugs from the victim's body. They were positively matched to the Uzi rifle recovered in the defendants' vehicle. The two automobiles used by the defendants were searched at Holy Cross Hospital the same date. Items recovered were a digital police scanner, an Uzi rifle, two casings, a box of nine millimeter ammunition, $17,000.00 in cash, gloves, Uzi paperwork, and targets. A representative from National Gun Sales states that Petitioner and Johnson purchased the Uzi rifle in question. Also, all three defendants went to a firing range to shoot the rifle.

Defendants went to Holy Cross Hospital immediately after the shooting. Otte had a gunshot wound to his foot. Petitioner told officers that he and his brother (Otte) were shot at and his brother was hit. A nine millimeter bullet was recovered from Otte's foot. Petitioner was interviewed by officers after a Miranda waiver. He admitted to buying a rifle, to conspiring to rob and murder the victim and to being the shooter. Otte was also interviewed with a Miranda waiver. He admitted to picking up the victim in Johnson's vehicle and taking the victim to the crime scene for an ambush. He said that all three planned the robbery/murder approximately two weeks prior. Johnson was interviewed as well with a Miranda waiver. He did not admit to being involved in the robbery-murder. He did admit to lending Otte his vehicle and firing the Uzi at the firing range. All defendants were taken into custody without incident.

**DISCUSSION**

I.      Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

1  *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this

2  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

3  of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other

4  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

5  principles set forth by the Supreme Court at the time the state court renders its decision." Id.

6       Finally, this Court must consider whether the state court's decision was "contrary to, or

7  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

8  72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may

9  grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

10  Court on a question of law or if the state court decides a case differently than [the] Court has on a

11  set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

12  at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

13  state court identifies the correct governing legal principle from [the] Court's decisions but

14  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at

15  413.

16       "[A] federal court may not issue the writ simply because the court concludes in its

17  independent judgment that the relevant state court decision applied clearly established federal

18  law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

19  A federal habeas court making the "unreasonable application" inquiry should ask whether the

20  state court's application of clearly established federal law was "objectively unreasonable." Id. at

21  409.

22       Petitioner has the burden of establishing that the decision of the state court is contrary to

23  or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

24  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the

25  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

26  state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th

27  Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

28       AEDPA requires that we give considerable deference to state court decisions. The state

1  court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

2  interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*,

3  537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

4  II.    Review of Petition

5        A parole release determination is not subject to all the due process protections of an

6  adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see

7  also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural

8  protections that particular situations demand). "[S]ince the setting of a minimum term is not part

9  of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not

10 constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at

11 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole

12 board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive

13 advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an

14 "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the

15 inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the

16 Board must be supported by "some evidence" having an indicia of reliability. Superintendent,

17 Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th

18 Cir.1987).

19       "In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not

20 comport with 'the minimum requirements of procedural due process,' unless the findings of the

21 prison disciplinary board are supported by some evidence in the record.'  472 U.S. 445, 454

22 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass, 461 F.3d at 1128.  In

23 determining whether the "some evidence" standard is met, the Court need not examine the entire

24 record, independently assess the credibility of witnesses, or re-weigh the evidence.  Id.  Rather,

25 the Court must determine whether there is any evidence in the record that could support the

26 conclusion of the disciplinary board.  Id., *citing* Superintendent v. Hill, at 455-56.  Although Hill

27 involved the accumulation of good time credits, the same standard applies to parole, as both

28 situations "directly affect the duration of the prison term."  Id., *citing* Jancsek v. Oregon Bd. of

6

Parole, 833 F.2d at 1390.

In making a determination whether an inmate is suitable for parole, the BPH is guided by

the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 Cal. Code Regs. §§ 2402(a) and (b).

Further, when an inmate is considered for the first time at the initial parole consideration

hearing, "[a] parole date shall be denied if the prisoner is found unsuitable for parole under

Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under

Section 2402(d). 15 Cal. Code Regs. § 2401.

In this case, with regard to the procedural protections outlined in Greenholtz, Petitioner

was provided all that is required.  Petitioner was given with advance notice of the hearing, he was

offered representation by counsel at the hearing, he was granted an opportunity to submit

materials for the Board's consideration and an opportunity to be heard during the hearing, and he

was provided a written decision explaining the reasons why parole was denied.  See Answer,

Exhibit B.

Petitioner, however, contends the BPH's decision was arbitrary and capricious and had no

evidentiary support.  After reviewing all relevant evidence, the Court finds that the state court

decisions rejecting Petitioner's claims were not unreasonable, because the BPH's decision is

supported by "some evidence."

In denying parole in 2004, the BPH considered and found several factors indicating

7

1   unsuitability per § 2402(c).[3] First, the BPH relied on the facts of the commitment offense.

2   Pursuant to § 2402(c)(1)(B), the Board found the first degree murder was carried out in a

3   dispassionate and calculated manner. This finding is certainly supported by "some evidence."

4   Petitioner and his crime partners planned the murder well in advance. They purchased an Uzi

5   rifle specifically for this purpose. They took the Uzi rifle to a practice range and learned how to

6   use it properly. They then ambushed and executed the victim in a remote location, leaving his

7   body in some bushes. These facts fit well within the contours of § 2402(c)(1)(B).

8       The Board further found the murder was committed in an exceptionally cruel and callous

9   manner pursuant to § 2402(c)(1)(D).  The record shows this finding is also supported by some

10  evidence. As stated above, Petitioner shot multiple times at the victim and struck him twice in

11  the chest using an Uzi while lying in ambush. Petitioner even struck his co-defendant in the foot

12  with an errant shot. He then left the victim dead or dying in the bushes. In light of these facts,

13  there is some evidence to support the finding that the offense was carried out in a callous

14  disregard for human suffering. 15 Cal. Code Regs. § 2402(c)(1)(D); Biggs v. Terhune, 334 F.3d

15  910, 916 (9th Cir.2003).

16      The BPH also found the motive for the killing was trivial. The record shows the

17  motivation for this crime was cash in the amount of $17,000.00. Clearly, the act of ambushing

18  someone and then executing him with an Uzi rifle is vastly disproportionate to the trivial motive

19  of obtaining $17,000.00 in cash.  Thus, the Board's finding that the motive was trivial is

20  supported by some evidence. 15 Cal. Code Regs. § 2402(c)(1)(E).

21      The Board further found that Petitioner lacked insight into his offense. In support of this

22  _____

23      [3] Pursuant to Title 15, of the California Code of Regulations, Section 2402(c) sets forth circumstances
    tending to demonstrate unsuitability for parole when the prisoner committed the offense in an especially heinous,

24  atrocious or cruel manner.  The factors to be considered include:
        (A) Multiple victims were attacked, injured or killed in the same or separate incidents.

25      (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-
        style murder.

26      (C) The victim was abused, defiled or mutilated during or after the offense.
        (D) The offense was carried out in a manner which demonstrates an exceptionally callous

27      disregard for human suffering.
        (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

28  15 Cal.Code Regs. § 2402(c)(1)(A)-(E).

                                    8

finding, the Board referenced the previous psychological reports prepared by examining

psychologists. While the more recent report prepared by Dr. Walker found the inmate's level of

insight was appropriate, the two previous psychologists had found Petitioner had not developed

an appropriate level. Specifically, the two previous psychologists noted that Petitioner was

superficial and continued to carry antisocial and narcissistic features in his personality. The

Board did not find Petitioner would not pose an unreasonable risk of danger to society in light of

the two previous reports, especially given the fact that despite his findings, Dr. Walker noted that

Petitioner still continued to carry narcissistic and antisocial features in his personality. In line

with this finding, the Board found Petitioner needed additional programming to develop the

appropriate level of insight into his offense, and this finding is supported by some evidence.

The Board also noted that Petitioner had a stable social history prior to the offense. He

was raised in a loving household. He graduated from high school and had gone on to attend

college and then gained employment. There was very little history of drug abuse. And, he had a

minor criminal history, having been convicted once of burglary as a juvenile. While a stable

social history is one factor that the Board may consider as a circumstance tending to show

suitability per § 2402(d)(2), the Board did not so find in this case. In fact, Petitioner's stable

social history made the murder appear so much more aberrant and caused the Board to find him

that much more unpredictable.

The BPH also considered factors tending to show suitability. It was noted that Petitioner

had not received a single "128A" chrono during his incarceration, and he had received only one

administrative "115" ten years before. The Board further noted that Petitioner maintained a high

TABE score and had acquired numerous certificates of proficiency. In addition, he received

training in vocational machine shop and silkscreen, and was currently taking Emergency

Management Institute courses. He also completed several self-help and volunteer programs.

Nevertheless, the BPH found these positive factors, while promising for a possible future grant of

parole, did not outweigh the Board's determination that Petitioner remained an unreasonable risk

of danger to society if released.

It is apparent the Board considered all relevant evidence in this case and carefully

1   balanced and assessed the various factors. Those findings were supported by at least "some

2   evidence."

3        Petitioner also listed as a claim in his petition that the "parole hearing was a pro forma

4   sham following a predetermined policy." However, other than this brief allegation, this claim was

5   never addressed or developed in the petition. Respondent did not respond to it. The claim as

6   stated was completely conclusory and unsupported by any evidence.  See  Allard v. Nelson, 423

7   F.2d 1216, 1217 (9ᵗʰ Cir.1970) (Conclusory allegations in a habeas petition fail to state a claim

8   and do not suffice to shift the burden to the state to answer an order to show cause.); James v.

9   Borg, 24 F.3d 20, 29 (9th Cir.1994) ("Conclusory allegations which are not supported by a

10  statement of specific facts do not warrant habeas relief."); Jones v. Gomez, 66 F.3d 199, 204-05

11  (9ᵗʰ Cir.1995) (holding that conclusory allegations made with no reference to the record or any

12  document do not merit habeas relief). In his traverse, however, Petitioner now asserts that there is

13  a policy in place mandating that the Board never grant a parole release date at an initial parole

14  consideration hearing. This claim was not fairly presented in the petition and is therefore not

15  cognizable. Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir.1994) ("A Traverse is not the

16  proper pleading to raise additional grounds for relief"). In any case, there is no merit to the claim.

17        Petitioner points to computer print-outs submitted by Respondent which purportedly

18  demonstrates that approximately seven (7) persons from 2002 to 2006 were initially granted

19  parole at their first hearing. This evidence is insufficient for this Court to find that there exists a

20  blanket policy mandated by the governor which requires parole denial at the initial hearing. The

21  fact that seven individuals were initially granted parole contradicts Petitioner's claim that the

22  parole board is mandated to "never" grant parole.

23        As further support, Petitioner points to the case of Coleman v. Board of Prison Terms,

24  2005 WL 4629202 (E.D.Cal.).  In Coleman, the district court found that under Governors Wilson

25  and Davis there existed a sub rosa policy that all murderers would be found unsuitable for parole.

26  2005 WL 4629202 *2. Coleman is distinguishable from the instant case. In Coleman, there was a

27  substantial record of unrefuted evidence which showed such a policy existed. The evidence

28  included:

> sworn testimony [from former Board members] that the policy was enforced by (1) appointing Board members less likely to grant parole and more willing to disregard their statutory duty; (2) removing Board members more likely to grant parole; (3) reviewing decisions finding a prisoner suitable and setting a new hearing before a different panel; (4) scheduling rescission hearing for prisoners who had been granted a parole date; (5) re-hearing favorable rescission proceedings and hand-picking panels to ensure the desired outcome; (6) panel members agreeing upon an outcome in advance of the hearing; and (7) gubernatorial reversal of favorable parole decisions.

Id. In addition, statistics were presented that only one prisoner out of 4,800 was released on parole. Further, there was evidence Governor Davis himself stated he would deny parole to all murderers. When asked about whether extenuating circumstances should be a factor in murder sentences, he stated: "No. Zero . . . They must not have been listening when I was campaigning . . . . If you take someone else's life, forget it." Id., *citing* In re Rosenkrantz, 29 Cal.4th 616, 684 (2003).

In this case, however, there is no such evidence. Governors Davis and Wilson are no longer in office, and Governor Schwarzenegger has not stated he subscribes to such a policy, nor is there any proof of it. The actions and statements of former governors cannot be imputed to the present governor. In addition, there is no indication that the panel did anything but carefully consider each factor in evaluating Petitioner at his initial parole release hearing. The statistical data referenced by Petitioner is simply insufficient. Without more, Petitioner's assertion of a blanket policy is pure speculation, and in any case as previously stated, the claim is not properly before the Court. Further, since the Court has found there is at least "some evidence" supporting the decision of the current panel, what could be gained if the Court found the panel was not impartial and ordered a new hearing before a new panel?

In light of the above, it cannot be said that the state court resolution of Petitioner's claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d).

///

///

11

**RECOMMENDATION**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The petition for writ of habeas corpus be DENIED; and

2.      Judgment be entered in favor of Respondent.

This Findings and Recommendations is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:**   **September 12, 2007**          **/s/ Dennis L. Beck**
                                                        UNITED STATES MAGISTRATE JUDGE

12